UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**SCOTT FLETCHER,**

**Plaintiff,**

**-vs-** **Case No. 6:05-cv-585-Orl-31DAB**

**UNIVERSAL TECHNICAL INSTITUTE, INC., CLINTON HARLEY CORPORATION OF DELAWARE, INC., d/b/a Motorcycle Mechanics Institute,**

**Defendants.**

---

# ORDER

The Plaintiff, Scott Fletcher ("Fletcher") sued the Defendants for unpaid overtime wages and unpaid wages, alleging violations of the Fair Labor Standards Act, 29 U.S.C. section 201, *et seq*. ("FLSA"), Chapter 448 of the Florida Statutes, and Florida common law. (*See* Doc. 1). This matter is presently before the Court on the Defendants' Motion for Summary Judgment (Doc. 35) and Fletcher's Response thereto (Doc. 41).

## I. Background

A. Parties

Fletcher was an employee of the Motorcycle Mechanics Institute ("MMI") from April 7, 2003 through July 27, 2004. (Doc. 35, Att. 2 at 2). MMI is owned and operated by Universal Technical Institute, Inc. ("UTI").[1] (*Id*. at Att. 1 at 3).

---

[1] MMI and UTI will collectively be referred to, where appropriate, as the "Defendants."

B. Facts

*1) The Defendants' educational programs; time scheduling and reporting*

MMI offers educational programs to teach students how to become motorcycle repair technicians. (Doc. 35, Att. 1 at 3). It offers an entry-level program lasting twenty-seven weeks, and an advanced program lasting thirty-six weeks that focuses on specific motorcycle manufacturers. (*Id.*). One manufacturer for which MMI offers the advanced program is Harley Davidson. (*Id.*).

MMI operates its school on three shifts: morning, afternoon and evening. Instructors are paid on an hourly basis. (*Id.*). They are scheduled to work for 7.5 hours per day, totaling 37.5 hours per week.[2] (*Id.*; *see also* Att. 12 at 2). However, instructors only have five hours and ten minutes of instructional time per day, and may use the remaining two hours and twenty minutes to do other work such as grading papers, preparing course work, meeting with students and other instructors, or completing teacher training exercises. (Doc. 35, Att. 1 at 4; Att. 12 at 2). MMI uses this schedule in order to avoid "incidental overtime." (Doc. 35, Att. 12 at 2). If an instructor works more than forty hours in a week, he or she is paid 1.5 times his or her regular rate of pay for each hour in excess of forty hours in a week. (Doc. 35, Att. 1 at 4).

Instructors self-report the hours they work on a time sheet that they submit at the end of each pay period. (Doc. 35, Att. 12 at 3). Instructors are reminded that they need to report the hours that they work, and that they are not to work at home or "off campus" unless they receive approval from management, nor are they to work overtime without approval. (*Id.* at 3-4).[3] There

---

[2] Instructors are able, with management approval, to work two shifts in one day, or 12.5 hours per day. (Doc. 35, Att. 1 at 4).

[3] By requiring approval, MMI seeks to manage its budget and to prevent employees from later claiming to have worked overtime. (Doc. 35, Att. 12 at 4).

is evidence, however, that Kim Krummel, MMI's Education Manager ("Krummel"),[4] told instructors that there was no "approved" overtime, that they were not to work overtime, and that if they did work overtime they were not to record it on their time cards.[5] (Doc. 41, Att. 1 at 56, 105; Att. 8 at 2).

*2) Fletcher's schedule and work requirements*

Fletcher was hired as an instructor in the Harley Davidson department. (Doc. 35, Att. 1 at 4). Fletcher's schedule was to work 7.5 hours per day, Monday through Friday.[6] (Doc. 35, Att. 3 at 10).[7] For example, when he worked the evening shift, his shift began at 4 p.m., class started at 6:10, and class ended at 11:30. (Doc. 41, Att. 2 at 81-82). He was paid until 11:30, but it was not possible for him to finish his work by then, because he had to close the classroom, ensure that the doors were locked, and inventory all the tools, tool boxes and motorcycles. (*Id*. at 82-83, 181-82). He never worked on Saturday or Sunday. (Doc. 35, Att. 3 at 10). He did not work double shifts on a routine basis. (*Id*. at 7). Fletcher did work overtime on several occasions when he was authorized to do so, and he was paid for that time. (*Id*. at 9-10; Att. 5 at 7).

At one point, Fletcher developed a grading system on his own initiative. (Doc. 35, Att. 4 at 16). He developed this system at home, and notified Krummel that he was working on the project

---

[4] Fletcher acknowledges that Krummel was his supervisor. (Doc. 41, Att. 2 at 91).

[5] Krummel also told instructors that he would get in trouble if instructors recorded overtime hours on their time cards. (Doc. 41, Att. 1 at 58).

[6] Fletcher states that he was scheduled for 37.5 hours per week, and that the company did not want anything to do with time after that or with overtime. (Doc. 41, Att. 2 at 135).

[7] Fletcher was hired as an hourly employee. (*See* Doc. 19 at 3; Doc. 35, Att. 2 at 10).

at home. (*Id*. at 17). Krummel told Fletcher that "he didn't care," and that it "didn't bother him."[8] (*Id*. at 18). The creation of the program took weeks. (Doc. 41, Att. 2 at 213). Prior to developing the program, Fletcher spent between twenty and twenty-five hours per week grading materials. (*Id*. at 214). Using the program saved him approximately ten hours per week, but he devoted the extra time to other matters, such as "polishing" the curriculum. (*Id*. at 289-90).

Fletcher also performed other work at home. (Doc. 35, Att. 5 at 8). For example, the school underwent a change in the curriculum in March of 2004. (Doc. 41, Att. 2 at 57). Fletcher helped work on the materials for the new curriculum. (*Id*. at 222-23). He met with another instructor every day for at least one and one-half months, during which time they would brainstorm and then Fletcher would work on the curriculum at home. (*Id*. at 226). Fletcher states that Krummel asked them to work on the curriculum, that they discussed it with Krummel, and that Krummel knew what they were doing. (*Id*. at 226-27). Fletcher did not ask for approval to work overtime on the curriculum. (*Id*. at 227). Instead, he just asked, "what can we do?" to which Krummel responded, "do what you want and then show me what you got." (*Id*.). Fletcher advised Krummel that he had worked at home, but he did not advise Krummel that he had not recorded his time related to that work. (Doc. 35, Att. 5 at 8; *see also* Doc. 41, Att. 9 at 1).

Fletcher also worked on Competency Based Skills Development ("CBSDs") at home. (Doc. 35, Att. 4 at 19). Completing the CBSDs required varying amounts of time: some took one hour, others six hours, and others could not be completed in a single week. (Doc. 41, Att. 2 at 109). Fletcher states that various individuals at MMI, including Krummel, told him to work on

---

[8] Krummel denies telling Fletcher that he could or should work on the grading program at home. (Doc. 35, Att. 2 at 6). In fact, Krummel denies authorizing Fletcher to work on any project at home. (*Id*.).

CBSDs at home.[9] (Doc. 35, Att. 4 at 19-20; Att. 5 at 2). Krummel did not, however, tell Fletcher not to record the time he spent working on the CBSDs at home. (Doc. 35, Att. 5 at 3). Other employees report, however, that they were told not to report the extra time they worked, they only could record the time they worked on campus but not the time they worked at home, and they would be in trouble if they recorded overtime hours. (Doc. 41, Att. 3 at 82-83, 91, 115).

Fletcher acknowledges that he was paid for 7.5 hours per day, he was in class for five hours and ten minutes per day, and that he had approximately two and one-half hours per day when he was not teaching. (Doc. 35, Att. 4 at 20). He asserts, however, that he could not complete tasks such as grading and CBSD during the ten hours of work each week during which he was not in the classroom, because, for example, he had to be in the classroom one-half hour before class started, and he spent the other two hours grading and updating his grade books.[10] (*Id*. at 21; Doc. 41, Att. 2 at 241-42). Instead, he states that the tasks he was required to perform in addition to teaching required an additional twenty hours per week over and above the 37.5 hours for which he was paid.[11] (Doc. 35, Att. 4 at 21). He did not, however, keep records of how many hours he actually

---

[9] Krummel denies telling Fletcher to work on the CBSDs at home. (Doc. 35, Att. 2 at 6).

[10] Other employees state that CBSDs can generally be completed in one hour or less, and that instructors generally complete them before or after class or during breaks. (Doc. 35, Att. 11 at 4, 7). Further, the task of grading exams can be completed by the instructor during class time or "can easily be completed during the extra 2 hours and 20 minutes of paid work time." (*Id*. at 4, 8).

[11] Other employees state that overtime "is seldom, if ever, needed to perform the job of an instructor." (Doc. 35, Att. 11 at 5). Fletcher, however, has offered the statements of several employees challenging these statements, in which instructors report that they had tasks that they needed to perform which weren't performed "on the clock," and that they struggled to get their work done under a schedule that did not allow them sufficient time to accomplish their tasks, and that they did not report those hours. (*See* Doc. 41, Att. 1 at 56, 58, 73; Att. 3 at 128, 144-45; Att. 8 at 2; Att. 10 at 1).

worked, and thus the twenty hour number is an estimate.[12] (*Id.*). Fletcher states that throughout his employment he informed his supervisors that he worked hours above and beyond his regularly scheduled shift at home, (Doc. 41, Att. 9 at 1), but he never complained to Krummel or any other manager about not being paid for overtime work or about his concern that he did not have sufficient time in the 37.5 hours he was scheduled to work to complete all of his required tasks.[13] (Doc. 35, Att. 4 at 21, Att. 5 at 2, 4, 10, 18-19). Another instructor, however, reports that he advised Krummel that Fletcher was working overtime hours. (Doc. 41, Att. 1 at 111-12; Att. 8 at 2).

Fletcher asserts that he did not complain about overtime because it was "taboo," in that management did not want instructors working overtime, did not want to pay for overtime, and threatened the instructors that if they worked too much overtime, they would not receive a Christmas bonus.[14] (Doc. 35, Att. 5 at 4). He states that Krummel did not threaten him personally, however.[15] (*Id.* at 6). Fletcher also was not aware of any agendas specifically advising instructors

[12] Fletcher's time cards did not reflect the hours he worked at home. (Doc. 41, Att. 9 at 2).

[13] The only people to whom Fletcher did complain about not being paid for overtime were not supervisors. (Doc. 35, Att. 5 at 2).

[14] Fletcher later retracts his use of the word "threaten," and says simply that management did not like instructors to work overtime without seeking approval to do so. (Doc. 35, Att. 5 at 6). Nevertheless, Fletcher asserts that the company would terminate employees for complaining about overtime pay, but he was not aware of any employee who was terminated for that reason. (Doc. 35, Att. 5 at 11, 13).

[15] Later in his deposition, however, Fletcher states that he heard "firsthand" from Krummel that he should not record time worked in excess of forty hours per week and that if instructors worked more than forty hours per week they risked jeopardizing their holiday bonuses. (Doc. 35, Att. 5 at 9). He subsequently explains that Krummel would "state stuff like, we have to keep -- stay under budget if we want to get a Christmas bonus," but that Krummel never specifically told him that he was not allowed to put in for overtime because the company would go over budget and the employees would not get a Christmas bonus as a result. (*Id.* at 15).

not to record time they worked in excess of forty hours per week and that if they worked in excess of forty hours per week they risked jeopardizing their holiday bonuses.[16] (*Id*. at 9).

Fletcher never had discussions with Krummel about completing his time card or about filling it out incorrectly, nor did anyone ever reject one of this time cards. (Doc. 35, Att. 3 at 8, 12-13; Doc. 41, Att. 2 at 135). From time to time, employees would receive an email stating that they were to submit their time cards and complete them correctly.[17] (*Id*. at 21). He alleges that at one point Tom Salvador ("Salvador") told him not to record overtime on his time card because he would not be paid for it.[18] (*Id*. at 13). Fletcher also alleges that he witnessed other instructors, including Salvador, have their time cards rejected.[19] (*Id*. at 14). He did not, however, ask Krummel or anyone else at MMI why time cards were being rejected. (*Id*. at 17). He never witnessed Krummel reject an instructor's time card and/or tell an instructor to resubmit a time card

---

[16] Other employees state that they were not aware of Krummel or any other manager telling instructors not to record the hours they worked or discouraging instructors from working overtime. (Doc. 35, Att. 11 at 5). Fletcher has submitted the affidavit of one instructor to the contrary, in which the instructor states that he was told by Krummel not to claim as many hours on his time card as he actually worked. (Doc. 41, Att. 8 at 2).

[17] Fletcher acknowledges that there is a reasonable purpose behind such a request, because MMI is obligated to pay its employees for the time they worked and the company relied on the employees to record the amount of time they actually worked. (Doc. 35, Att. 3 at 21).

[18] Salvador flatly denies making such a statement to Fletcher. (Doc. 35, Att. 11 at 9). In any event, Salvador has never had the authority to hire or fire employees while working with MMI. (*Id*. at 6).

[19] Fletcher acknowledges, however, that he only saw an email to Salvador stating that Salvador was to "redo this time card," but he does not know whether Salvador actually worked more than forty hours during the relevant pay period, nor did he see any reference to overtime in that email. (Doc. 35, Att. 3 at 16-19). Instead, Fletcher relies on Salvador's statement that "he's rejecting my time card," and that the rejection was related to overtime. (*Id*. at 18-19). Salvador flatly denies ever having a time sheet rejected for recording more than forty hours in one week. (Doc. 35, Att. 11 at 9).

because the instructor had recorded more than forty hours of work.[20] (*Id*. at 18-20). Nevertheless, Fletcher asserts that he was aware that other instructors had their time cards rejected for recording more than forty hours of work in a given week, but he cannot remember the instructors' names. (*Id*. at 17, 20).

Krummel did tell Fletcher that he should not record the hours he worked in excess of forty hours per week unless those hours were previously approved. (Doc. 35, Att. 5 at 5). Fletcher never sought approval to work overtime, because he "found no reason to work overtime," and "didn't even mind doing the work at home." (*Id*. at 6).

Fletcher asserts that the company had to know that he worked overtime because he had a significant amount of work to complete and "[t]hey only give you so much time." (Doc. 41, Att. 2 at 277). He also asserts that if an instructor recorded unauthorized overtime on a time card, management would send the time card back, tell the instructor that the overtime was not authorized, and tell the instructor to remove the unauthorized overtime from the time card. (*Id*. at 131).

Fletcher's employment was terminated on July 27, 2004 as a result of several concerns. First, he had been coached at least ten times regarding his attitude in class, using the computer during class, and reading magazines in class. Second, when asked by students what to do if a manufacturer's representative gave them the wrong tools in their tool boxes, Fletcher told them to put the tools in their pocket and tell the representative that they never received the tools because "any time you can F**k the [manufacturer's representative] more power to you," and that if the

---

[20] Other employees have also stated that they were not aware of any instructor being told to revise their time sheet because they had recorded more than forty hours of work in a week. (Doc. 35, Att. 11 at 5, 9). Fletcher has submitted the affidavit of one instructor to the contrary. (Doc. 41, Att. 11 at 3).

students did not take the tools, he (Fletcher) would. (Doc. 35, Att. 6 at 2). Krummel concluded that the attempts at coaching had not improved Fletcher's attitude and that the company could not accept either vulgarity in the classroom or his approach to the manufacturer's representative and his advice to students to steal tools. (*Id.*).

C. Claims and Arguments

In Count I, Fletcher asserts a claim for unpaid overtime wages under the FLSA. In Counts II and III, respectively, Fletcher asserts claims against Universal Technical Institute and Motorcycle Mechanics Institute under Florida Statutes Chapter 448 under the title "Breach of Contract," alleging that each Defendant willfully failed to pay wages due him, which thus constitute unpaid wages recoverable under Chapter 448.

The Defendants assert that they are entitled to summary judgment on Fletcher's claims because Fletcher cannot demonstrate that they had knowledge, actual or constructive, that he was working overtime for which he was not compensated. In the alternative, the Defendants seek partial summary judgment on Fletcher's claim for liquidated damages under the FLSA, arguing that they acted in good faith. Finally, the Defendants move for summary judgment on Counts II and III, arguing that Chapter 448 does not protect hourly employees.

## II. Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929

F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[21]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

---

[21] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

## III. Legal Analysis

A. Defendant's Knowledge of Overtime

To prove that he was "employed" for the purposes of the FLSA, and to recover for uncompensated overtime work, a plaintiff must show "that his employer had knowledge, either actual or constructive, of his overtime work." *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986); *see also Holzapfel v. Town of Newburgh, NY*, 145 F.3d 516, 524 (2nd Cir. 1998) ("Work performed off-site must be counted as time worked only if the employer knows or has reason to believe that work is being performed.") (*citing* 29 C.F.R. §§ 785.11, 785.12) (internal quotations omitted); *Gaylord v. Miami-Dade County*, 78 F. Supp. 2d 1320, 1325 (S.D. Fla. 1999). The key inquiry is thus not whether overtime work was authorized, but whether the employer had knowledge that the employee was performing such work. *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997).

"An employer does not have knowledge of uncompensated overtime when an employee submits time sheets showing such overtime did not occur."[22] *Gaylord*, 78 F. Supp. 2d at 1325. Further, "where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer . . . of the overtime work, the employer's failure to pay for the overtime hours is *not* a violation of" the FLSA. *Harvill v. Westward Communications, LLC*, 311 F. Supp. 2d 573, 583 (E.D. Tex. 2004) (emphasis in original). Nevertheless, the Eleventh Circuit has found that "an employer's knowledge is measured in accordance with his duty to inquire into the conditions prevailing in his business," and that the "cases must be rare

[22] Thus, where an employee seeks to recover unpaid wages for overtime hours that the employee did not record on his time sheets, the employee must prove that the employer had actual or constructive knowledge of that overtime. *Bailey v. County of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996).

where prohibited work can be done and knowledge or the consequences of knowledge avoided." *Reich v. Dept. of Conservation & Natural Res., St. of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (internal citations, quotations and punctuation omitted). Thus,

> [i]n reviewing the extent of an employer's awareness, a court need only inquire whether the circumstances were such that the employer either had knowledge of overtime hours being worked or else had the opportunity through reasonable diligence to acquire knowledge.

*Id*. (internal citations, quotations and punctuation omitted). Accordingly, an employer may not escape liability for uncompensated overtime work of which the employer has actual or constructive knowledge merely by prohibiting overtime labor, *Reich*, 121 F.3d at 407, because an employer's "mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so." *Reich*, 28 F.3d at 1082 (*citing* 29 C.F.R. § 785.13) (internal quotations omitted).[23]

In this case, there is evidence demonstrating that the Defendants had both actual and constructive knowledge that Fletcher worked overtime hours for which he was not compensated.

---

[23] In *Reich v. Dept. of Conservation & Natural Res., St. of Ala.*, 28 F.3d 1076 (11th Cir. 1994), for example, the court found that where there was no indication that the employer did anything to discourage the overtime work required by its employees to properly perform their duties other than to promulgate a policy against such work and to urge employees to work their hardest during their scheduled time, such circumstances required the employer to do more than "simply periodically issue admonishments to avoid liability under the FLSA." *Id.* at 1083-84; *see also Reich*, 121 F.3d at 407 ("[I]t is settled that duties performed by an employee before and after scheduled hours, even if not requested, must be compensated if the employer knows or has reason to believe the employee is continuing to work and the duties are an integral and indispensable part of the employee's principal work activity. The employer who wishes no such work to be done has a duty to see it is not performed. He or she cannot accept the benefits without including extra hours in the employee's weekly total for purposes of overtime compensation. If the employer has the power and desire to prevent such work, he or she must make every effort to do so.") (internal citation, quotations and punctuation omitted).

Regarding actual knowledge, one instructor reported that he told Krummel that Fletcher worked overtime hours, and there does not appear to be any reason why Krummel could not have reviewed Fletcher's time cards to determine whether Fletcher was reporting those hours.

Clearly, the Defendants attempted to discourage instructors from working overtime by telling instructors that they should not work overtime unless it was authorized.[24] However, there is evidence that instructors were told that if they did work overtime they were not to report it on their time cards. Thus, it appears that the Defendants not only had an official policy against unauthorized overtime, but they also had an unofficial policy of turning a blind eye to overtime which the instructors seemingly needed to perform in order to accomplish all of the tasks associated with their jobs.[25]

Indeed, Fletcher has offered evidence that: (1) employees were told not to report overtime hours; (2) employees were told that they would be in trouble if they recorded overtime; (3) instructors struggled to get their work done under a schedule that did not allow them sufficient time to accomplish the necessary tasks; (4) complaining about overtime was "taboo;" (5) he was unable to perform tasks such as grading and CBSDs during the 37.5 hours per week he was scheduled to work; (6) Krummel told him to work on the CBSDs at home; (7) he worked at home to develop a grading system; (8) he worked at home to assist in overhauling the curriculum, a task

---

[24] An employer's discouraging overtime work does not, in itself, constitute a violation of the FLSA. *Whitaker v. Pacific Enterprises Oil Co. (USA)*, 956 F.2d 1170 (10th Cir. 1992) (unpublished opinion).

[25] While there is some dispute over whether instructors needed time beyond their scheduled 37.5 hours per week to accomplish all of their tasks, viewing the evidence in the light most favorable to Fletcher, it appears that various tasks required additional time. In any event, constructive knowledge "is not exclusively dependent on whether assigned duties could reasonably be performed in an allotted number of hours." *Holzapfel*, 145 F.3d at 525.

he performed at Krummel's behest; (9) Fletcher kept Krummel apprised of his progress on the curriculum and of the fact that he was working at home on that project; and (10) Fletcher reported that throughout his employment he advised his supervisors that he was performing work at home.

This evidence supports an inference that the Defendants had, at the very least, constructive knowledge that Fletcher worked overtime for which he was not compensated, despite the fact that Fletcher apparently never reported those hours or complained to anyone in a management position about working overtime. *See Cunningham v. Gibson Elec. Co., Inc.*, 43 F. Supp. 2d 965, 976 (N.D. Ill. 1999) ("Where an employer claims a lack of knowledge, but the evidence (as here) strongly supports an inference of deliberate ignorance, the proper conclusion . . . is that the employer knew about the overtime hours."). The Defendants' efforts to avoid knowledge of overtime will not shield them from liability, particularly because it seems clear in this case that with a minimal degree of diligence, they could easily have discovered that their instructors, including Fletcher, were working overtime. Therefore, summary judgment on Fletcher's FLSA claim is not appropriate. *See Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, (5th Cir. 1973) (defendant had constructive knowledge where it could have acquired knowledge of employees' overtime by exercising reasonable diligence, and where management insisted that work be completed within defined time limits and effect of instructions was that employees were limited in number of hours they could report irrespective of the number actually worked); *Cunningham*, 43 F. Supp. 2d at 976 (employer had knowledge where, *inter alia*, supervisor instructed employee not to report overtime hours; supervisor's professed lack of knowledge did nor relieve employer of obligation to inquire).[26]

---

[26] *Compare Bailey*, 94 F.3d at 157 (isolated incidents where employer was told that some employees were not recording all of their hours were not sufficient to put employer on notice that

B. Liquidated Damages

The FLSA provides that an employer who violates sections 206 or 207 of the Act will be liable to an employee in the amount of the employee's unpaid overtime compensation "and in an additional equal amount as liquidated damages." *Kennedy v. Critical Intervention Servs., Inc.*, 199 F. Supp. 2d 1305, 1306-1307 (M.D. Fla. 2002) (*citing* 29 U.S.C. § 216(b)) (internal quotations omitted). An exception to that rule exists, however, if the employer can show that the act or omission giving rise to the violation was in good faith and that the employer had reasonable grounds for believing that its act or omission did not violate the FLSA. *Id*. at 1307 (citing 29 U.S.C. § 260); *see also Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 142 (2nd Cir. 1999) (internal citations and quotations omitted) ("[c]ourts have discretion to deny an award of liquidated damages where the employer shows that, despite the failure to pay appropriate wages, the employer acted in subjective good faith and had objectively reasonable grounds for believing" that its acts did not violate the FLSA).

"The determination of whether an employer acted in good faith and had reasonable grounds for believing that its act or omission was not a violation of the FLSA has both subjective and objective components." *Kennedy*, 199 F. Supp. 2d at 1307. The employer bears the burden of

---

employees worked unreported overtime hours); *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (employer's access to information regarding employees' activities, standing alone, did not establish knowledge where employee was specifically ordered not to work overtime and employee did not demand payment for overtime); *Darrikhuma v. Southland Corp.*, 975 F. Supp. 778, (D. Md. 1997) (employee's unsupported allegations that employer was advised of his uncompensated overtime did not establish actual or constructive knowledge); *Gaylord*, 78 F. Supp. 2d at 1327 (employer lacked knowledge where majority of employee's overtime work took place at home, supervisors had not means of determining how employee spent time, and employee's records did not include claimed overtime hours).

proving both good faith and reasonableness, "but the burden is a difficult one, with double damages being the norm and single damages the exception." *Herman*, 172 F.3d at 142; *see also Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, (6th Cir. 2004) (burden on the employer is substantial). Liquidated damages are mandatory where the employer fails to show good faith. *Kennedy*, 199 F. Supp. 2d at 1307.

To show subjective good faith, the employer must show that it had an honest intention to ascertain what the FLSA requires and to act in accordance with those requirements. *Dybach v. St. of Fla. Dept. of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991). Good faith "requires some duty to investigate potential liability under the FLSA." *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979). In addition, the employer must satisfy the objective reasonableness component, under which the employer "must also demonstrate that it had reasonable grounds for believing that its conduct comported with the requirements of the FLSA." *Kennedy*, 199 F. Supp. 2d at 1307.

As the Court has discussed, Fletcher has provided evidence suggesting that not only did the Defendants have, at the very least, constructive knowledge of the fact that he was working overtime hours for which he was not compensated, but also that the Defendants engaged in efforts to, in effect, shield themselves from such knowledge, by advising instructors not to report overtime hours on their time cards and by creating an atmosphere where discussions of overtime work were taboo. Particularly in light of the fact that good faith requires an employer to investigate potential FLSA liability, the Court finds that, at this stage, the Defendants have not established subjective good faith and, for the reasons discussed above, have not demonstrated that their actions were objectively reasonable.

C. Counts II and III

The Defendants argue that they are entitled to summary judgment on these Counts because Florida Statute section 448.01 ("Section 448.01") does not apply to hourly employees.[27] The Plaintiffs respond that their claim is a breach of contract claim, the essence of which is "that the Defendant breached its oral agreement to pay plaintiff for all work performed for their benefit at an agreed hourly rate. Plaintiff is not claiming he is entitled to overtime for working in excess of ten hours a day." (Doc. 41 at 18).

Clearly, the language of the statute does not apply to Fletcher, who was employed as an hourly worker. *Quaker Oats Co. v. Jewell*, 818 So. 2d 574, 575 (Fla. 5th DCA 2002). Thus, his attempt to bring this action "pursuant to and arising under" Chapter 448 is entirely unclear, inasmuch as Section 448.01 appears to be the only section of that Chapter that could apply to the type of claim he has brought: a claim for unpaid overtime. Further, Fletcher's argument that his claim is, in reality, one for breach of contract is plainly disingenuous because Fletcher made not a single allegation in his complaint supporting his assertion that the claim arises out of a contract,

---

[27] Section 448.01 provides, in its entirety:

> (1) Ten hours of labor shall be a legal day's work, and when any person *employed to perform manual labor of any kind by the day, week, month or year* renders 10 hours of labor, he or she shall be considered to have performed a legal day's work, unless a written contract has been signed by the person so employed and the employer, requiring a less or greater number of hours of labor to be performed daily.
>
> (2) Unless such written contract has been made, the person employed shall be entitled to extra pay for all work performed by the requirement of his or her employer in excess of 10 hours' labor daily.

F.S. § 448.01 (emphasis supplied).

and, perhaps unsurprisingly, in his brief he failed to point to any evidence to support his "breach of oral contract" theory. Counts II and III appear to be nothing more than throwaway claims with neither factual substance nor legal support.[28]

## IV. Conclusion

For the reasons stated herein, it is

**ORDERED THAT** the Defendants Motion for Summary Judgment (Doc. 35) is GRANTED as to Counts II and III, and DENIED in all other respects.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 15, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

[28] Counsel are advised to be mindful that the limits set by Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 are real, as are the consequences for violating them.